Gregory B. Smith (USB 6657)
**GREG SMITH & ASSOCIATES** (ALAPC)
111 East 5600 South, Suite 105
Murray, Utah 84107
Telephone: (801) 651-1512
E-mail: gs@justiceinutahnow.com
*Attorney for Plaintiff, Aaron Roth*

---

### IN THE UNITED STATES DISTRICT COURT FOR THE
### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| AARON ROTH, <br><br> Plaintiff, <br><br> *vs.* <br><br> SILVER SPUR CONSTRUCTION, LLC, and HAROLD MARKS, an individual, <br><br> Defendants. | **COMPLAINT** <br><br> **Civil Case No.:** <br><br> **Judge:** |

Plaintiff, AARON ROTH, hereby complains against Defendants and each of them as follows:

### I.     PARTIES

1.     Plaintiff, Aaron Roth, is a U.S. citizen residing in Salt Lake County, Utah.

2.     Defendant Silver Spur Construction, LLC. is a Utah domestic corporation doing business in Utah[1] and Harold Marks is an individual residing in Salt Lake County, Utah..

### II.     JURISDICTION AND VENUE

---

[1] Entity Number: 5836779-0160; Company Type: LLC – Domestic; Address: 9901 S PROSPERITY RD WEST JORDAN, UT 84081 ; Registered Agent: SHAWN M HAYWARD; Registered Agent Address: 9901 S PROSPERITY RD WEST JORDAN, UT 84081.

3.      This Court has jurisdiction pursuant to the United States Fair Labor Standards Act (FLSA) because of Defendant's failure to properly pay overtime—29 U.S. Code § 201. (June 25, 1938, ch. 676, § 1, 52 Stat. 1060.) The FLSA generally requires employers to compensate employees at the overtime rate for all work performed over 40 hours per week. *Roy v. Cty. of Lexington*, 141 F.3d 533, 538 (4th Cir. 1998).

4.      The Court also has supplemental jurisdiction pursuant to 28 U.S. Code § 1367.

5.      Venue lies in the Unites States District Court for the State of Utah pursuant to 28 U.S.C. § 1391(b) and (c).  The parties reside in Utah and the facts took place in Utah.

## STATEMENT OF FACTS

Silver Spur Construction, LLC. Is a general construction company doing business in the State of Utah.  In early August of 2020, Defendants, Harold Marks and Silver Spur interviewed Aaron regarding a job that Aaron could have with Defendant Silver Spur.

1.   Harold Marks and Defendant Silver Spur were both employers of Aaron.

2.   Harold Marks and Silver Spur simultaneously directly controlled the work of Aaron.

3.   Harold Marks and Silver Spur are both employers under the FLSA.

   a.    they exercised significant control over the company's operations.

   b.   they had the power to hire and fire employees,

   c.   they had the responsibility to maintain employment records and both showed other signs of operational control over significant aspects of the corporation's day-today functions.

4.   The facts herein were committed by Harold Marks and Silver Spur jointly and severally.

2

5.  At all times while Aaron worked for Silver Spur, Silver Spur had a policy of encouraging its workers to apprise Silver Spur of any violation of the law.

6.  Aaron was hired after Aaron had reached out to Silver Spur (on or about July 30, 2020) by telephone.

7.  When Aaron reached out, Aaron asked if Silver Spur needed anybody to work for them.

8.  He was told to give Harold a call. Aaron did.

9.  Aaron told Harold that Aaron was a member of Local 3 Union,

10. and that he was a level A experienced operator,

11. and that Aaron would like to come to work for the company.

12. Harold said a drug tested needed to be taken,

13. and that some paperwork needed to be completed.

14. Aaron was then drug tested (and passed),

15. and properly filled out the paperwork.

16. Harold then contacted the Union,

17. and said that he wanted Aaron to work for Silver Spur.

18. The Union then told Aaron that Silver Spur wanted to hire him,

19. and then Aaron went to work for Silver Spur the next day.

20. Aaron was hired on or about the first week of August, 2020 (he believes that was August 3, 2020).

21. The Union dispatched Aaron as a scraper-operator,

22. which involves primarily moving earth.

23. There is no state or federal license required to operate a scraper vehicle (made by Caterpillar) that Aaron is aware of.

24. For the first few days, Aaron labored.

25. He used a shovel, broom, etc. to help clean up the streets and sidewalks to make sure things were safe for the vehicles working there.

26. The first week Aaron was asked to operate the water truck (by Harold),

27. and was told to drive it over US 36 in or near Stansbury Park, Utah.

28. Aaron was afraid if he did not do such that he would be fired.

29. About a week later, Aaron was working as a scraper hand.

30. Aaron perceived that Harold Marks was intoxicated, which alarmed Aaron because of how Harold's condition could seriously compromise the health and safety of others.

31. On about Friday, August 21, 2020, Aaron, per company policy, reported what he had perceived regarding the ostensible impaired state of Harold.

32. Pursuant to Silver Spur's policy, no employee will be fired for refusing to break a law.

33. Silver Spur's policy is that no employee will be fired or retaliated against for reporting a safety concern.

34. Silver Spur's policy, which Aaron understood, is that no employee would be fired—or retaliated against—for refusing to break a law.

35. After reporting Harold's ostensible intoxicated state, Harold approached Aaron,

36. and aggressively told Aaron that Aaron was in the wrong for telling the company Harold could have been in an impaired condition.

37. Aaron stated Harold should be treated as any other employee when it comes to health and safety issues.

38. Harold Marks is Native American, and he told Aaron that Harold had once worked for the "White Man," and the White Man now works for him.

39. Aaron understood that to mean that Harold felt no white person could ever complain against Harold,

40. and that Aaron was to do whatever Harold told him to do.

41. While working for Silver Spur, Aaron was never written up,

42. nor was he disciplined for any wrongdoing.

43. Silver Spur agreed to pay Aaron $27.90 per hour upon hiring him.

44. Upon hiring Aaron, Defendants were put on actual notice that Aaron had no license to operate a motor vehicle in Utah.

45. Aaron was shorted on average at least 2.5 hours per week on his overtime wages (at least 40 total hours of time and half, which is $1,674 that is still due and owing him, not including his attorney fees , nor his owed liquidated damages).

46. Aaron routinely worked more than 40 hours per week for Defendants.

47. The above is Aaron's best good faith estimate of what was not paid to him regarding the overtime.

48. Harold Marks and Silver Spur are employers for purposes of the United States Fair Labor Standards Act (FLSA).

49. Again, under the FLSA, Aaron was at all times a non-exempt employee for Defendants.

50. Harold and Silver Spur routinely made Aaron pre-sign time sheets in the mornings.

51. Although Defendants had Aaron sign such, Harold almost never saw when Aaron started work and when he finished work for Defendants.

52. Harold Marks' "records" of when Aaron worked for Defendants were improper (and they shorted Aaron of at least 2.5 hours of overtime weekly),

53. and Harold knew such.

54. Aaron tried to resolve this with Silver Spur, but to no avail, and

55. Aaron was intimidated to pursue the matter further (he did not want to be fired).

56. All hours worked by Aaron for Defendant were done with the consent of Defendants (they permitted such),

57. and Defendants either knew, or should have known Aaron was working those hours.

58. Aaron was told that he was not the first person to complain about such.

59. Aaron never felt right about signing a blank worksheet.

60. Harold often filled in the time sheet without Aaron being present,

61. which caused Aaron's hours to be false (too low).

62. On or about December 4, 2020, Aaron understood that a water-truck driver refused to drive the truck because it was apparently not legally operable,

63. or he did not have the proper licensure for such.

64. Defendant fired a person named Mitch , who had driven a water truck on or about December 4, 2020.

65. Mitch had worked somewhere near Toole, Utah.

66. The following Monday, December 7, 2020, Harold fired Aaron.

67. Prior to being fired, Harold had commanded Aaron to drive the water truck on US 36 (a public highway).

68. On December 7, 2020, Silver Spur had two water trucks rented from Equipment Share in North Salt Lake.

69. The trucks are described as follows:

a. 2021 Freightliner m2 106 2,000 gallons with a gvwr of 33,000 lbs (rental number 77559).

b. 2020 Freightliner m2 106 4,000 gallons with a gvwr of 54,000 lbs (rental number 46359)

70. The "4,000 gallon truck" was the truck Defendants demanded Aaron operate on the public highway.

71. Training is required to drive such trucks,

72. and if driven improperly, death can be caused to the driver or others.

73. Harold knew that Aaron was not legally allowed to operate the water truck in such a manner, and had no valid license.

74. Aaron told Harold that Aaron could not legally operate the water truck that way.

75. Harold told Aaron to fire up the water truck regardless, so it could warm up.

76. Then, Aaron clearly said that Harold knew Aaron did not have a CDL or license, so he could not legally drive the truck.

77. Harold then made it clear the he did not "give a shit."

78. Harold made it clear that nobody else did either.

79. Harold then said that if Aaron refused to work, Aaron could "be down the road."

80. Aaron protested again that he had neither a license nor a Commercial Drivers License (CDL).

81. Harold then essentially stated that nobody else does either.

82. Aaron understood that being "down the road" meant "fired," but sought more clarity.

83. So, Aaron asked Harold if Harold was going to fire him because he did not have any right to drive *that truck* on the road.

84. At this point, Corey (a coworker and Harold's son) chimed in.

85. Corey said that they had already gotten rid of one person.

86. Aaron then heard Aaron concur with that statement.

87. Aaron understood that to mean that that one person *was fired for refusing to break the law by driving illegally*.

88. Aaron was quite surprised by what he heard.

89. Aaron then asked if they were going to get rid of him (for refusing to break the law).

90. Harold then plainly said, "yes."

91. So, Defendants fired Aaron because Aaron refused to break the law.

92. Harold never told Aaron that Aaron was being let go because of downsizing.

93. Silver Spur then claimed Aaron was let go because as the temperatures dropped, [Aaron] was part of a company-wide reduction in force (requiring layoffs).

94. Aaron "knew" that a CDL was required by law in order to drive the water truck at issue.

95. CDL licenses are required for the driving of some vehicles, so that the public is protected.

96. In other words, the firing of Aaron for his refusal to drive the water truck implicated a clear and substantial public policy (to protect the public's health and safety).[2]

---

[2] https://www.tdcaa.com/wp-content/uploads/DE-A-Prosecutors-Guide-to-Basics-of-Commercial-Vehicle-Licensing-and-Violations.pdf (February 22, 2021):  Because the safe operation of certain large vehicles require specialized knowledge and skills, every state and the federal government requires operators of those vehicles to possess a valid CDL. 49 CFR 383.23(a) (2010) For CDL purposes, FMCSA defines a commercial motor vehicle (CMV)

97. Silver Spur condoned the unlawful firing and was part of it.

98. Silver Spur has condoned the improper payments of overtime.

99. Silver Spur has condoned improper record keeping.

**Causes of Action**

---

as one that is used for business purposes, involved in interstate or intrastate commerce and has any one or more of several specific characteristics. Those characteristics include a having a GVWR/GCWR of 26,001 pounds or more, being designed to transport 16 or more passengers including the driver, or transporting enough hazardous materials to require placarding under federal guidelines (or any amount of materials designated as special agents or toxins).

If a vehicle meets the definition of a CMV, its driver will need (barring certain legal exemptions discussed below) a state CDL issued in compliance with federal regulations. Title 49 Code of Federal Regulations (CFR) Parts 383 and 384 deal specifically with CDLs and driver requirements. The rules establish the requirement that all drivers operating qualifying CMVs hold a valid CDL issued by a certified state. GVWR (gross vehicle weight rating) and GCWR (gross combined weight rating) describe the weight rating established by the vehicle manufacturer

 If a vehicle meets the definition of a CMV, its driver will need (barring certain legal exemptions discussed below) a state CDL issued in compliance with federal regulations. Title 49 Code of Federal Regulations (CFR) Parts 383 and 384 deal specifically with CDLs and driver requirements. The rules establish the requirement that all drivers operating qualifying CMVs hold a valid CDL issued by a certified state.  One exception to this rule is contained in 49 CFR 383.23(c) which allows drivers with valid "state's learners' permits" to operate commercial motor vehicles in order to obtain "behind-the-wheel" training   These regulations were developed "to help reduce or prevent truck and bus accidents, fatalities, and injuries by requiring drivers to have a single commercial motor vehicle driver's license and by disqualifying drivers who operate commercial motor vehicles in an unsafe manner." 49 CFR 383.1(a) (2010)

The same federal regulations detailed in 49 CFR 383 place obligations on both drivers and employers. Drivers, for instance, are required to inform current and prospective employers regarding specified convictions (having implications on their CDL status) and their employment history. Employers are required to allow only drivers with valid licenses to operate their vehicles. The federal regulations ensure that wherever a driver or carrier operates, they do so with a certain standard of behavior.

 Federal regulations establish minimum standards of CDL drivers' ability and proficiency. A primary requirement for licensing is that a driver be able to demonstrate the requisite level of knowledge regarding the rules of the road for CMVs. 49 CFR 383.23(a)(1) states that as of April 1, 1992 "no person shall operate a commercial motor vehicle unless such person has taken and passed written and driving tests which meet the Federal standards" detailed within the CFR language.  Pursuant to the CFR, all commercial motor vehicle operators seeking a CDL must have "knowledge and skills necessary to operate a CMV safely."[20] It is important to note that, before being issued a CDL, all drivers are required to become familiar with the safe operation regulations governing the type of vehicle they are operating or anticipate operating. These regulations cover "vehicle inspection, repair, and maintenance requirements; procedures for safe vehicle operations; the effects of fatigue, poor vision, hearing, and general health upon safe CMV operation; the types of motor vehicles and cargoes subject to the requirements; and the effects of alcohol and drug use upon safe commercial motor vehicle operations."  49 CFR 383.111(a) (2010)

100. Plaintiff asserts any cause of action that the facts, either known or not yet known, will support, including possible FLSA retaliation.

**i        Plaintiff alleges that Defendant owes him for unpaid overtime wages per the FLSA.**

101. The facts show Aaron worked overtime at the rate of least 2.5 hours per week for which he was not paid (in other words, his overtime was underpaid).

102. Aaron was at all times a covered, nonexempt employee per the FLSA.

103. Defendants failed to pay Aaron overtime for all the hours he worked over 40 per workweek at the rate of at least 2.5 hours per week (at the rate not less than one and one-half times the regular rate of pay).

104. The amount of unpaid wages is at least $1,674, not including the liquidated damages, which should be an equal amount of the unpaid overtime.

105. Defendant failed to properly keep the payroll records of Aaron,

106. and deliberately maintained false ones.

107. Defendant failed to display (and notify Aaron of) an official poster outlining the requirements of the FLSA.

108. Defendant is also liable for Aaron's attorney fees, liquidated damages, and costs of filing suit per the FLSA.

**ii.        Plaintiff alleges that Defendants wrongfully terminated him.**

109. To establish a wrongful termination claim in Utah, certain elements must be met, which Aaron meets.

110. The first element is met.  Aaron was fired by Defendant because he refused to break the law (by driving a water truck without the proper licensing);

111. The second element is met: a clear and substantial public policy existed.  The purpose of requiring licensure for driving a truck such as a water truck is to

promote and protect the public's health and safety, and to regulate the institution

itself of driving such a vehicle.  Thus, the law on point does not merely regulate

the relationship between private individuals such as an employer and an

employee; rather, it has a much broader scope.  Further, there are *criminal penalties*

for violating such laws (to ensure they are complied with). By violating the law,

Aaron would have subjected the public to injury, and would have subjected

himself to criminal prosecution.

112.  The third element is met:  Aaron's conduct (refusal to break the law) brought the

policy into play;

a.  The fourth element is met: the discharge (firing of Aaron) and the conduct

bringing the policy into play are causally connected.  Defendant fired Aaron the

same day he refused to break the law, and the firing was directly attributable to

his refusal to break the law.[3]

**iii  Plaintiff alleges that Defendant, Silver Spur, breached an implied-in-fact**

**contract with him, and Defendant, Silver Spur, violated the covenant of good faith**

**and fair dealing**:

113. Defendants' unlawful firing left Aaron in a vulnerable position, which

114. caused Aaron to lose work, have a diminished reputation and loss of earnings,

and incur foreseeable legal fees.

115. He was fired on December 7, 2020.

---

[3] *Stone v. M&M Welding & Constr., Inc.*, 2013 UT App 233, ¶ 1, 312 P.3d 934

116. His average paycheck had been between (roughly) $1,100 - $1,300 weekly (they should have been higher, but he was not properly paid his earned overtime wages).

117. At the date of filing (February 23, 2021), Aaron has been out of work all but one week.  So, he lost three weeks of pay in December of 2020, and approximately six 6 weeks thereafter (he did mitigate his loss by being able to work one week in which he earned approximately $700).  So, he's lost about 9 weeks of pay, which is at least $9,900.

118. These are ongoing damages.

119. It was reasonably foreseeable that Aaron would (as a direct result of the unlawful firing) would incur attorney fees, which Defendants should pay.

120. Defendant has a policy of encouraging its workers to apprise Defendant of any violation of the law, and they broke that policy by firing Aaron.

121. Defendant has a policy of encouraging its workers to apprise Defendant of any issues regarding safety, and they broke that, too.

122. Defendant seeks for consequential damages in addition to actual damages for this cause of action.[4]

For the reasons given above, the Court should find Defendants liable on at least causes of actions, and award Plaintiff the damages that he may establish at trial.

**Prayer for Relief**

Aaron Roth prays that the Court award:

---

[4] Plaintiffs who prevail in employment cases may recover damages for general and consequential injuries resulting from the breach of an employment contract, including consequential damages for the breach of the covenant of good faith and fair dealing by an employer *Heslop v. Bank of Utah*, 839 P.2d 828, 830 (Utah Sup.Ct. 1992)

(a) damages, which will be established at trial (which will be consistent with what

has been given above, but the lost wages are a continuing matter),

 (b) liquidated damages,

(c) consequential damages,

(d) attorney fees and costs, and

(e) any and all other damages that are fair and just such as pre-and-post-judgment

interest.


DATED this 22nd day of February 2021.


/s/ Gregory B. Smith, attorney for Aaron Roth